Good morning, your honors. Richard Stack, representing the Coopers in this particular case. I'm going to go where the money is in this case, and I think the most interesting issue is the taxation of the patent, the royalties on the patents. The thing to keep in mind here is there's really three different families of patents. There's the low patents, which end in number 489, the U.S. patent numbers, and those were removed from Technology Licensing Company and assigned to Watonga in like early to mid-2006. The second family of patents is the projection patent, which ends in number 038. Not a lot happened with those patents from what I can see in the record. They're not really referred to very much in the briefs. The main patent that generated the most money is the resolution enhancement patents, number 780. Counsel, I think we're familiar with the underlying facts. I think to just get to the heart of the issue that I would appreciate your addressing, the corporate form was done in a way that would permit the favorable tax treatment. The question really is whether the holder of the patent informally controlled the entire corporation so that the capital gains treatment is disallowed. So why did the tax court clearly make a mistaken finding of fact in concluding that the other people involved in the corporation basically simply operated exactly as Mr. Cooper told them to even when it wasn't in their own financial interest and that the others were just figureheads? What's wrong with those findings? Well, Your Honor, I think the initial issue that we have with the tax court is it applied an incorrect legal standard. It engrafted onto the plain language of Section 1235 an indirect control requirement. And as, you know, you know I'm not Well, Your Honor, as you're aware of, there is the sham transaction doctrine. So if all you have is a form that has no substance whatsoever, you can just sham out the transaction. And I think that's implicit in, you know, that's a basic principle of taxation. Right. I think that's exactly it, right? So if somebody set up a form in the way Judge Graber is describing and retained just 24 percent but gave the rest to his kids, that would be a sham. So why is this really different? And why did the district court err by deciding that it really was different? Or tax court, forgive me. Given that these were people who were very closely affiliated, a relative, a close friend, and then there's evidence that they acted on occasion contrary to their own best interests? Well, Your Honor, in this particular instance, you know, if you look at the Charlson case, the shareholders there were very closely related as well. And the same thing with the Lee case. I believe it was a friend of the inventor. Right. And this kind of inquiry is always going to be factually intensive, it seems. Yes. Yes, it is, Your Honor. Was there any evidence in this case beyond the relationships themselves to show control? Sometimes there can be formal control, some separate trust document or assignment of voting rights or contractual provision for voting rights. Sometimes there can be reform as a matter of practicality, like a transfer to a minor child and the transferor is actually the guardian with authority to vote the shares. And sometimes there could be an informal understanding that everybody really understands and there's testimony to. Was there any of that? I'm not aware of anything, Your Honor. I believe that the tax courts, the basis for its factual conclusions were essentially inferences, inference upon inference upon inference. Well, the transactions that were contrary to their interests, to their own interests as well as to the interests of the corporation, which we just alluded to. Well, again, if you look at the net result, the amount of the patents that Mr. Cooper received was no more than about 53 to 68 percent on average, which is actually a lot less than in Charleston where there was an 80-20 split. The inventor got 80 percent. I think one thing that maybe wasn't really brought out, we alluded to it in our briefs, it wasn't really brought out at the trial, is that IP Innovation in 1999 and later Acacia Technologies was assigned the resolution enhancement patents. That's the most lucrative one. And it was the subsidiaries, it was Acacia and then the subsidiaries that owned an undivided interest in all substantial rights to the patents. And the Acacia subsidiaries had the sole authority to license, enforce, and protect the patent family. Mr. Cooper testified to that effect at pages 732 and 733 of the record. He did not control, it's undisputed, he didn't have any control over IP Innovation or Acacia. All he had was, I believe, a one-third vote as an officer. And there was no way for him to exercise control over those companies. Those were controlled by Anthony Brown, who was in charge of commercializing those very lucrative patents. So I think that's something that really has been missed in this case by the tax court. Remind me, how does that tie into the theory? Well, it basically ties into the theory that there is no monopoly right that TLC could have exercised authority over or control over, such that Mr. Cooper could be deemed to have basically not transferred those patents. I guess the question is whether the TLC itself, whether the transfer to TLC itself is valid. That's probably the wrong word. It was valid, but whether he controlled it, not whether he controlled something else. Because I think that was the way the issue was framed as I understood it at the tax court. It was to some extent. There is evidence, though, about the role of Acacia and IP Innovation starting in 1999 after Mr. Cooper had a problem with Leckrone and his patent commercialization and the shortfall of about $500,000 of funds. And we're dealing here with the tax years 2006 through 2008, correct? That's correct. And during those years, the resolution enhancement patents were under the sole authority of, it would have been Acacia by then. Tell me, why doesn't it create a problem, arguably an insuperable problem, that TLC gave Cooper back the patent rights that Cooper took back for his children and no consideration was paid to TLC? You're talking about the, I believe, a right of first refusal? I thought some patents were transferred to the new corporation that was owned by his children. I think Walter and Coulter signed off on a transfer of rights back to Mr. Cooper without receiving consideration for the, to TLC. I believe that was in early 2006, if I recall. The reason for that is that the, you know, the reason for that is that TLC had breached its duty to commercialize those patents. That's a new argument on appeal, is it not? Yes, yes. It was not raised to the tax court, so what are we supposed to do with that? It's a purely legal issue, as we've argued in our brief, and that's something that this court has indeed considered. Well, ordinarily we do not consider arguments that are raised for the first time on appeal because the tax court didn't have a chance to consider that or make findings about it or anything. It's been fully briefed by the parties. There's no reason why, you know. Well, except our waiver doctrine, there's no other reason, but ordinarily we don't look at new issues, correct? Yes, I understand that, Your Honor. There are exceptions to that rule, though, of course. Can you give any other reasons that were argued? Any other reasons? Why that transfer does not prove that the transfer of rights was insubstantial. Well, I believe we've shown that there was a royalty of, I believe, $72,000 that was paid by Watonga to TLC, and that's in the stipulation of facts. I believe it was paragraph 50, if memory serves. Well, all that really says, it seems to me, is that there were facts going both ways, but we're reviewing on a record that potentially contains facts going both ways. We generally give some deference to the fact finder, do we not? Yes, I understand, Your Honor. And I believe we've pretty much, you know, addressed each and every one of the inferences that the tax court made, and we've, by and large, refuted it fairly effectively. I mean, obviously that's, you know, that's my opinion. I would like to, obviously, persuade you folks to embrace that as well. Let me just see here. You know, I think that, you know, let's get into the control issue here as to TLC. Again, you know, it's difficult to see how this case is differentiated from the situations in Charlson and Lee. In those cases, the courts found against the government. They found there was not an indirect control over the company. And, again, we've argued. Argument that the case is so on point, so factually similar that, I mean, I'm trying to get past the burden that you've got here. This is a tough burden. It's standard for you, so can you articulate that for me? Yes. I mean, you know, for example, unlike Mr. Charlson, Mr. Cooper never participated in litigation as a joint plaintiff with the patent commercialization company. And, you know, like Jermaine, I believe, or rather like the situation in Charlson, Mr. Cooper did provide assistance in terms of the patent commercialization. And, I mean, that's really the same thing that happened in Lee as well. It's just difficult to understand, you know, how it's any different from this particular situation. There really isn't very much evidence that, you know, that Mr. Cooper controlled TLC. All we have is some circumstantial evidence that Your Honor has mentioned about the transfer of the low patents. But, you know, we submit that actually benefited TLC because they ended up getting $72,000 that they hadn't gotten before when it was TLC that was doing the patent commercialization. And they basically had fallen flat on that and not done their job. So what you're saying is, yes, TLC transferred patents for no consideration so far as the record before the tax court shows to a new corporation for the benefit of Cooper's children. But the practical effect was TLC made money it wouldn't have made because the royalties from the patents went to TLC. That's correct. That's correct. Another thing I'd like to point out is that if you look at the… Why does that disprove control? I don't know if it necessarily disproves control, but it's a factor that would maybe weigh against the finding that there is control. He could have made a lot more money if he had just taken the patents back himself instead of used Watonga and not paid TLC anything back once those patents were commercialized, the low patents. The real question is whether it was a genuine transfer of all substantial rights. Correct, Your Honor. If they gratuitously transferred the patents back to him, that would perhaps support an inference that it wasn't a bona fide transfer, that it was a sham transfer. On the other hand, if he gratuitously paid the royalties back to them, TLC, that would show that it… Good heartedness. I'm not sure I see why that shows that it was not a sham transfer of all substantial rights. I think we have to be careful using the word sham because the tax court specifically asked the government at the end of the trial whether they were relying on a sham theory, and the answer was no, we're not. And the tax court judge, Judge Marvel, made it very clear that that was… No, it's whether the substantial rights, the phrase that Judge Kleinfeld led to, was the basis. Correct, yes. I'm very familiar with that. And, again, the statute talks about direct or indirect transfer between related persons, okay? It doesn't talk about indirect control. So, you know, I think our primary argument is that everybody got it wrong as far as what the correct legal standard was. You've got to look at the plain language of the statute. You can't just… Do you need that? You're saying that even if a taxpayer did exercise actual control over the transferee, that it would still amount to a transfer of all substantial rights? It would be… You would meet the literal terms of the statute, which I think the tax court found had been met. Right, but since Gregory v. Helbring, the literal terms aren't enough. Well, yes, but by the same token, she also found it wasn't a sham, so that, you know, TLC was a real living thing. I mean, as much as a corporation can be living, it was a bona fide entity. There was no question as to whether it was a correct, a properly constituted entity, the formalities were followed. So that's not really the issue. I think the, you know, the whole thing is, you know, it's a transfer that must not be directly or indirectly between related persons. It doesn't have – the statute doesn't talk about, you know, indirect or direct control. Did you wish to save some rebuttal time? Yes, I think I should. Thank you, Your Honors. I'll do that. Good morning, Your Honors. Clint Carpenter for the Commissioner of Internal Revenue. May it please the Court, by definition, a patent holder cannot transfer all substantial rights to a patent without relinquishing control of the patent. Counsel, I have a problem with the tax court's view and its reading of the facts. The idea is that he was close enough to, what was it, his sister-in-law or his sister-in-law's best friend? Sister-in-law and his wife's friend. And his wife's friend and his sister-in-law. So as a practical matter, they would do whatever he wanted. So it should not be treated as a transfer of substantial rights because it really kept Cooper in control of the patents. That would be a part of it. I think what the tax court found was that Mr. Cooper retained control, in fact, retained control of the patents by controlling the corporation. So it wasn't the identity. Does the identity of the other people matter as to whether they're friends or not friends? Isn't really the only issue whether there was factually control? No, I think that was one fact that certainly supported the finding of control, but not necessarily the conclusive fact. That first question was just a lead-up to what's really on my mind here. What's really on my mind is any corporation that has a genius is likely to be highly deferential. For example, when Edwin Land was alive, I have no doubt that the board did anything he said. My guess is that Warren Buffett's corporation does anything Warren Buffett says, even though they're a whole bunch of directors and they're not his sister-in-law or his wife's best friend. When the big bucks come at issue, though, for example, if Warren Buffett decided to buy this corporation for a particular price and they were deciding whether to sell at that price or seek a higher price or not sell at all, that's when the closest of friends and relatives become enemies. I mean, I'm just dealing with another case right now where the brothers wind up litigating with each other, even though they've been brothers and it's been a family business for the better part of a century. Happens all the time. So I just don't see why the fact that they deferred to their genius as long as there was nothing to fight about shows that he had control. Fact of the matter is he had 24 percent, and that's less than the statutory bar, which was lowered from 50 percent to 25 percent. So he's okay there. And his wife's best friend is not even related. The sister-in-law, well, he could get into an argument with his wife and the sister-in-law might side with her sister instead of with him. The fact that they all follow his lead when there's nothing to fight about and he's the genius who came up with all these lucrative inventions, I don't see why that proves control. Sure. I don't see why it's even evidence that he has anything like actual control, as opposed to people just deciding it's in their best interest to let him do what he wants, because he's the guy that knows more and makes more money than they do. Sure. I think that certainly could be a possibility. I don't see why it isn't the only possibility. I mean, 24 percent means you lose if you lose the loyalty of 51 percent. Sure. And I think that the issue is a narrow one in the sense that what the statute is concerned with is whether Mr. Cooper divested himself of the substantial rights, whether he sold the patent. Was it really a transfer of all substantial rights? Right. Or was it just on paper a transfer of all substantial rights? That's really the question, isn't it? Yes, exactly. That is the question. And so no question on paper it was a transfer of all substantial rights. And as far as I can tell, the only evidence that the tax court relies on to conclude that it wasn't really is he was close with these people, at least for the moment, and that they gave him back that stock for his children. Right. The patents for his children, I mean. Those are two important facts, and I think the facts— What else? Is there any more? Yeah, there is. There's essentially what—the evidence showed that what Mr. Cooper wanted to do with the patents is what happened in every instance, or at least in every instance— Now, you understand my thought that that's meaningless, insignificant, because he's the genius. Many corporations have a genius, and they'll defer to him as long as there's nothing to argue about. But perhaps they just agreed with him that that was the best—think of it that way. What if they just agreed with him and came to the same conclusion? Sure. In the tax court, the burden was on the taxpayers to prove that they divested themselves, that Mr. Cooper divested. It is, but there's some weight to be given to his conformity to the tax law. I mean, the reason that Congress lets inventors take capital gains treatment is obviously to encourage inventors, and the reason that they dropped it from 50% to 25% was to work a little more precisely on just what the incentive to inventors has to be. They want inventors to have the incentive. So he goes to his lawyer. He does the 24%, the separate corporation, and it's his sister-in-law and his wife's best friend, and best friends forever often are not forever. Sure. Yes, I think the difficulty comes in that essentially if you—the alternative, I think, the alternative that you're proposing is essentially that a paper transfer is enough. No, counsel. No, counsel, look at it this way, if you would. It's possible these people exercised—I mean, just from the fact that they agreed with him, that doesn't get you there. They could have exercised independent judgment and reached the same conclusion. So what's the government's strongest argument, that they really just totally deferred to him as opposed to independently doing their homework and agreeing with him? Sure. It's the examples of times when they took actions that were against TLC's interests or against their own interests. So the first one is that they returned valuable patents to him for free, but just because he wanted them back. The second would be that the compensation that the officers and directors received, less than 1% of the revenues that TLC took in, they took in approximately $30 million from inception through 2008, and the total, if you add it all up, the total compensation the officers and directors received was less than 1% of that, even though— Officers, of course, serve without compensation, so what's your next argument? Well, they were compensated as directors. Well, directors ordinarily receive nominal consideration or small consideration. What's your next argument? You were going through your bullet points. Sure, and so there's a complete absence of evidence that the other officers and directors participated meaningfully in any of the substantive decisions. And whose burden was it to show that they did? It was their burden. It was their burden. And I read in your briefing you're concerned about their distance, lack of proximity, lack of background in the area, lack of day-to-day involvement. Sure, sure. Those are all factors, and those are factors that the tax court weighed. A very important factor is that the evidence that was offered that Mr. Cooper did not control TLC consisted almost entirely of testimony, and the tax court made a finding that that testimony was not credible. Okay, so if we look at this bundle of these data points and we could reasonably decide either way, is your position the government wins? That they didn't meet their burden of proof, isn't that it? That's correct. I mean, from a sort of big step back, the point of allowing the capital gains treatment is that a bundle of rights has been sold off to someone else, just like selling off, you know, other assets, you know, or real estate or something, that it's gone, and therefore it's entitled to capital gains treatment. So whether it's sensible or not sensible for people to go along with the original patent holder really doesn't advance the answer to that question either way. Well, it might have been. I think we're getting at the same thing, which is where is the control? And if there's – where's the indicia of control? And I don't think just that they – the only point I'm trying to make is in response to Judge Kleinfeld's question, it doesn't seem to me that just that they agreed with him or even agreed with him consistently doesn't really get you there, doesn't get you all the way there. It's an important data point, it seems to me. Sure, sure. But it doesn't seem to really get you there to show that he really, truly exercised control. That's all. I don't think Judge Graber and I are disagreeing upon the standard here. I take that point. I think, however, it does support the tax court's finding when they are – when the decisions that are being made are decisions that benefit Cooper, Mr. Cooper, to the detriment of TLC. And so as another – I'm sure of that. You know, I'm thinking back actually to – I think this is analogous. When I first became a district judge, we would have court meetings at the district court, small court, small meetings. The chief judge was a very, very experienced judge. There were several occasions where I thought we should do one thing, he thought we should do another. And I thought about it and I thought, well, on the one hand, my opinion is we should do this thing. On the other hand, he has a lot more experience than I do, and I trust his judgment more than I trust my own judgment. I can't see why that would not be exactly the same thing in this corporation. They have independence. They can vote the way they want, but they'd be fools actually not to trust Cooper's judgment more than their own judgment, so long as it's not going to affect them deeply. Now, if it was something where it was a proposed buyout and it could mean they get millions of dollars more or less, depending on whether they go with his judgment, which means they get less, or their own judgment, which means they get more, that's when they're likely not to trust his judgment anymore and to assert themselves more. But I just can't see why, where they've got no matters, where their interests are so sharp as to lead them to reject his judgment, why their deference to it proves control any more than when I was a new district judge, my deference to the chief judge would prove that he had control over me. He didn't. Right. I think there wasn't a huge instance like a buyout, for example, as you're saying. Yeah, the occasion never came up. There are instances, though, where the actions that they took were they did what Mr. Cooper wanted, even though it was to either their own or the company's detriment. And so, for example, in giving those four patents back to him, one of those patents, well, three of those patents, five days later Mr. Cooper then transferred them to the other entity that had essentially the same officers and basically the same structure, and then over the course of the next year that patent brought in $120,000. And so if TLC had kept that patent and sublicensed it itself instead of giving it back to Mr. Cooper, who gave it to this other entity, those $120,000 would have come to TLC. The record doesn't reflect conclusively why Mr. Cooper did that, but it certainly may have. What kind of revenue are we looking at here compared to the $120,000? Is that nickels and dimes or is it a major part of the revenue at issue? It's over the course of the corporation from its inception to 2008 was about $30 million. In the tax years at issue, I don't recall specifically, but it was in the millions. So it wasn't a huge portion. But, again, companies acting in their own interest don't give away assets for free. The only reason for them to do that was because Mr. Cooper wanted them back. And there's no evidence that he gave them reasons why it was in their interest. They probably wouldn't do when they think that otherwise they'll alienate the guy who makes the big bucks. For example, a corporation giving a charitable contribution to the CEOs or chairmen, whoever is the most valuable person, thinks of as a pet charity. It may not be all their pet charities, but if he says, we ought to give $100,000 to my pet charity, it's wonderful for sick children or whatever, they're likely to do it rather than alienate him. That's possible, but that's not what the tax court found. And there's no evidence that that's what they were doing. It's sort of speculation that perhaps that's what was going on. But that's not what the evidence showed. Again, if you can't look at these stories. It's hard for me to tell because their discussion wasn't necessarily that precise. For example, you said that they rejected the credibility of the persons who testified on Cooper's side. They don't go that far, and they don't explain. They just says, we do not find credible any testimony by petitioners that TLC was an independent corporation that Mr. Cooper did not control. A conclusory, unexplained rejection of any credibility that would undermine their conclusion. But they don't even say what testimony they don't think was credible. Well, yes, beyond sort of the testimony that was to the effect that Mr. Cooper did not control. They just said, if it's against us, we reject it. They didn't even say what they don't believe. Well, the tax court didn't believe the testimony that was contrary to what the other evidence tended to show. Well, to their conclusion. They don't say what testimony was contrary. No, there's not specific statements or things of that nature. One other point that I wanted to bring out of a right that was essentially handed over to Mr. Cooper. When TLC entered into the sublicenses with the Acacia subsidiaries, TLC had rights under the written agreements that provided that TLC still had participation in one agreement, could even veto, but participation in the decisions that the Acacia companies would make about commercializing the patents. The evidence showed that it was actually Mr. Cooper who was exercising those participation rights. And then in 2005, TLC made that, what was actually happening, made that explicit and entered into an agreement that expressly provided that TLC doesn't have the vote in that anymore. Mr. Cooper has the vote in that. And so, again, they're giving away rights to Mr. Cooper that rightfully, or under the terms of the original transfer agreement, should have belonged to TLC. A related issue, but it's a separate issue, is the question of the right to terminate at will. Under the regulations, a patent holder who retains a right to terminate the transfer of patents at will has retained a substantial right. And so the return to Mr. Cooper of those patents without consideration, that's evidence of his control, but it's also separately evidence that he, in fact, retained a substantive right to terminate at will. I don't see why it means he retained a substantial right to terminate. I mean, if he'd asked for more, they might well have said no. That might have been a little touchy for him. We don't know. And we don't know what testimony might or might not have been believed by the tax court. Surely, if someone were on Polaroid's board and Edwin Land wanted something that didn't seem to make a lot of sense, but he wanted it, they would probably think our number one job here is to keep Edwin Land happy. And they'd be right, too, because once he died, Polaroid failed and went bankrupt. I understand. That's probably true. And, again, it's possible that's what was going on here, but that's speculation. There's no evidence that that's what was going on here. The burden was on the taxpayers to prove that Mr. Cooper actually gave up the rights and didn't retain control over his patents. And the evidence showed that in all the instances that are in the record, that Mr. Cooper still was exercising control over his patents. Now, is it possible that ---- So you say any time a request by the founder and creator is honored, that shows he has control? No, not necessarily. As was mentioned earlier, it's a fact-intensive inquiry in every case. And that's what Congress intended. The legislative history shows Congress intended it to be a test that looks at all of the circumstances. I think all that Congress said was if you give away all the patent rights and you hold less than 25 percent of whoever you give them to, then it's capital gains. That's what Congress said. Everything else is not what Congress said. It's applying the Gregory versus Helvering line of authority to the transfer. And the regulations. Yes, but there also is a regulation that effectively incorporates that legislative history. In the tax court, didn't the taxpayer agree to the standard? Yes. And then there's this whole waiver issue that we haven't gotten into, where in terms of their challenge to the legal standard, the sort of the Charlson standard you might call it, yes. They didn't challenge it. They didn't. Not only did they not challenge it, they expressly embraced that standard. They advocated for that standard. And now they're asking for a do-over. And there's significant prejudice there, not just to the government, but to the tax court. Because if their argument is correct, that essentially that as a matter of law, control doesn't matter, if that argument is correct, then this issue should have been decided on summary judgment. There wasn't a need to have a trial of this issue. Instead, the parties went to trial because they both agreed that this positive issue was the factual issue of control. Thank you, counsel. You've exceeded your time. I believe there's some rebuttal time remaining for Mr. Stack. Thank you. There are two other issues in the case which I'm not going to address, because I think we're kind of focused on the patent issue. But obviously we don't waive any of those arguments. Bad debt and penalties. Yes, exactly. No, but we've got them. And I think to the extent that the court might rule in favor of us with regard to the taxation of the patent royalties, then that would obviously greatly reduce any penalties that might otherwise apply. I would just like to point out one thing here. As Judge Kleinfeld has mentioned a few times, Mr. Cooper is a genius. He's the holder of many, many patents which we use every day when we watch TV. The question isn't whether it's sensible for people to listen to him or not. It's whether he really and truly divested himself of the patents. And so it really isn't about whether other people would defer to him or not. It's about whether they did, in fact, exercise independence or not. And if they didn't, whether it's because they were related or friendly or because they thought he was so much of a genius that they didn't wish to even think about these issues, I'm not sure why that matters if he, in fact, didn't really divest himself of the patents. Isn't that sort of the fundamental factual issue here? Yes. Yes, it is, Your Honor.  Well, I understand that. But if he, in fact, exercised the control, which I know you don't concede, the reason why he exercised it doesn't matter either, does it, whether it's because he was smarter than other people and they knew it or whether because they were friends or whatever. If he exercised control, then he loses. And if he didn't exercise control, he wins. And I guess I'm not sure why the reasons behind it matter. Well, obviously, if you're the inventor, you know the most about your patent. You know how it's most effectively used. You could advise as to how it should be used, which he did with the patent commercialization companies. With regard to Ms. Walters and Coulter, they were professional women. I believe one of them was the CEO or CFO of a charitable organization. Another owned a construction company. Counsel, but you're just fundamentally not engaging in this. There are data points from which the tax court could have reached the opposite conclusion, but you have to convince us that the trial court's factual finding about control is clearly erroneous, right? Yes. Don't you worry if I misunderstood the standard here? Yes, that is the standard. I think that's what Judge Graber is getting at. Okay. Well, you know, it's our position that the tax court really did not specify how control was exercised, other than the fact that these people were all closely related to each other, in which case the ultimate conclusion to be drawn is that the tax court or that the court in Charleston should have found for the government, as well as the court in Lee. So in other words, I guess to sum up the finding here, the factual finding about control was clearly erroneous. It really sounds like you're saying because they reached a different conclusion in Charleston, and I want to give you a chance to correct that. I'm sure that's not what you mean, but what tells me that the tax court. I'm just saying that could be the ultimate conclusion you could draw from the way the tax court reasoned. The tax court really did not focus on, you know, exactly how Mr. Cooper controlled TLC, other than to talk about, you know, various factors. And really there was very little money that TLC made during these years at issue, as we pointed out. I think the expenses exceeded the income by about $23,000. Thank you, counsel. Thank you, Your Honor. The case just started as submitted. We very much appreciate the arguments from both counsel. They've been very helpful.
judges: Kleinfeld, Graber, Christen